# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X  09-49420-ESS

IN RE:

**VAN E. JOHNSON,**                                      Chapter 13

           Debtor

-------------------------------------------------------------X  CASE NO. 13-01445

**VAN E. JOHNSON**

                    **Plaintiff**

**v.**

**WELLS FARGO BANK, N.A. d/b/a AMERICA'S SERVICING COMPANY**
(As Master Servicer)
9062 Old Annapolis Road
Columbia, Maryland 21045

**BANK OF AMERICA, NATIONAL ASSOCIATION**
**AS TRUSTEE  FOR MORGAN STANLEY TRUST  2006-6AR**
(As Trustee) by merger with LASALLE BANK NATIONAL
ASSOCIATION, a national banking association
135 South LaSalle Street, Suite 2910
Chicago, Illinois 60603

**MORGAN STANLEY CAPITAL I INC.**, a Delaware
corporation, as depositor (the "Depositor").
1585 Broadway
New York, New York 10036

**MORGAN STANLEY & Co**. as Underwriter.
**MORGAN STANLEY MORTGAGE CAPITAL INC.**, as Seller
1585 Broadway
New York, New York 10036

**IDEAL MORTGAGE BANKERS** d/b/a LEND AMERICA (Originator)

**KR MANAGEMENT LLC & MALCO REAL ESTATE INC.**

John and Jane Does 1 Through 10.

                    **Defendants**

-------------------------------------------------------------X  **JURY TRIAL DEMANDED**

## AMENDED COMPLAINT OBJECTING TO THE PROOF OF CLAIM

&

**FOR DECLARATIVE JUDGMENT AND RESCISSION OF LIEN.**

Plaintiff, Debtor, Van E. Johnson, by their undersigned attorney, allege as follows:

**<u>INTRODUCTION</u>**

1.     This is a complaint, grounded as objection to proof of claim, under bankruptcy law to strike, deny or expunge the claim of Morgan Stanley Trust 2006-6AR, as filed by Bank of America (BOA) as trustee allegedly serviced by American Servicing Company (ASC), originated by Lend America and for rescinding lien existing by virtue of such loan, for violating the very norm of lending and running afoul of the strictures of law-- "to protect individuals obtaining home loans in the sub-prime lending market . . . ." NY Bill Jacket, 2002 A.B. 11856, Ch. 626, New York Bill Jacket, 2002 A.B. 11856, Ch. 626. Aim of this bill was to curtail "the increased use of sub-prime lending and high-cost home loans," which, "had led to a rise in predatory lending practices that are targeted primarily at low-income individuals and the elderly." <u>Id.</u>

2.     Complaint is also premised on the fact that the Proof of Claim as filed by Defendants, Wells Fargo Bank, dba America's servicing Company, Bank of America, NA as Trustee for Morgan Stanley Trust 2006-6AR is a result of financing which resulted from or violated Equal Credit Opportunity Act, 15 U.S.C. 1691; Fair Housing Act, 42 U.S.C. § 3601; Civil Rights Act, 42 U.S.C. § 1981 & 1982 in its schematic origination and sale in the secondary market rendering the loan uncollectible and thus rendering the lien redundant. These are continuing violations, as the demand for collection of this loan persist.

3.     Banks, like Lend America aka Ideal Mortgage Bankers, working under the tutelage of Morgan Stanley and its subsidiaries, ambitious to roll out tranches of loans as securities to unwary investors, with deliberate insouciance and or schematic conduct, engrafted gullible

consumers on their rolls as homeowners, providing them American dreams that never in reality turned real from a debt to ownership. For the same, the banks, made predatory loans without any consideration of repayment capacity of these borrowers. Lend America with help from Morgan Stanley was solely concerned with recruiting new borrowers, targeting the minorities like the debtor and selling that debt into the secondary market via securitization process. Even the credit-rating agencies, supposedly neutral assayers of risks in mortgage securities, turned a blind eye to the quality of such loan, for they had their own fees rolling out from such securitization. On the originator side, since loan was off the books, as soon as they closed the deal with the borrowers, it was not their concern whether the loan performs or fail. Morgan Stanley the facilitator of the funding reaped huge benefits in terms of fees from securities issued thereof . These banks primarily targeted the minorities and other ethnic pockets that which were vulnerable to such commercial exploitation. The debtor, Johnson, was one such target: an African-American man.

4.      Lend America, the originator of this loan made misrepresentation and falsely certified that the loans met the Fanie Mae guidelines for acceptance for securitization. Lend America intentionally manipulated  the loan applications and documentation and purposefully sold very high expensive loan to the borrowers and they targeted minorities for the same. Lend America defrauded the United States government as well as the generally public at large, especially the minority borrowers.  Attached is a copy of the Complaint which was filed with the United States District Court, Eastern District of New York, along with the copy of the judgment which delineates the practice of Lend America at the time of the origination of this loan. Ex. A.

5.      Lend America could arrange for such expensive financing with active support of Morgan Stanley, for Morgan Stanley in turn stood to profit from securitizing such deals.

6.    Having originated the loan through mortgage outlet and complicity of Lend America, Morgan Stanley thereafter sold it in the secondary market. However the real ownership of the Note is still a matter of speculation.  ASC and BOA claims to be owner of the loan as servicer and trustee of the loan trust.

7.    Lend America targeted minorities, as it found that African-Americans like Van Johnson were easily manipulable despite good credit. In furtherance of their scheme, the Ideal sought through their brokers and advertisements these vulnerable borrowers like the debtor. Morgan Stanley through its various subsidiaries funneled money for such mortgages which targeted such minorities.   Upon information and belief, Lend America facilitated as mortgage lender the following loans in the year 2006 when the plaintiff was made to sign a predatory loan.

[INTENTIONALLY LEFT BLANK]

## Mortgage Loan Application Totals and Details for IDEAL MORTGAGE BANKERS, LTD in 2006

| Loan Purpose | Total Number of Mortgage Applications | Total Dollar Amount of Mortgage Loans Applied For | Average Mortgage Loan Amount | Highest Mortgage Loan Amount | Average Applicant Income | Highest Applicant Income |
|---|---|---|---|---|---|---|
| **Home Improvement** | 0 | $0 | $0 | $0 | $0 | $0 |
| **Home Purchase** | 1,947 | $529,442,000 | $271,000 | $2,000,000 | $84,000 | $645,000 |
| **Refinancing** | 1,697 | $447,374,000 | $263,000 | $1,610,000 | $78,000 | $840,000 |

| Applicant Race | Total Number of Mortgage Applications | Total Dollar Amount of Mortgage Loans Applied For | Average Mortgage Loan Amount | Highest Mortgage Loan Amount | Average Applicant Income | Highest Applicant Income |
|---|---|---|---|---|---|---|
| **American Indian or Alaskan Native** | 6 | $801,000 | $133,000 | $296,000 | $45,000 | $98,000 |
| **Asian** | 24 | $7,364,000 | $306,000 | $796,000 | $103,000 | $225,000 |
| **Black or African American** | 1,692 | $441,344,000 | $260,000 | $900,000 | $72,000 | $480,000 |
| **Hispanic** | 892 | $269,285,000 | $301,000 | $999,000 | $89,000 | $540,000 |
| **Native Hawaiin or Other Pacific Islander** | 18 | $4,926,000 | $273,000 | $628,000 | $51,000 | $134,000 |
| **Not applicable** | 0 | $0 | $0 | $0 | $0 | $0 |
| **Not Provided** | 79 | $20,797,000 | $263,000 | $687,000 | $80,000 | $362,000 |
| **White** | 933 | $232,299,000 | $248,000 | $2,000,000 | $90,000 | $840,000 |

It is thus not surprising that these minorities suffered the heaviest foreclosure.

http://www.nytimes.com/interactive/2009/05/15/nyregion/0515-foreclose.html

8.     In their ambitious venture to make profits, defendant Morgan Stanley discriminated against African Americans when Lend America issued predatory loans and that they did and could do so as a result of Morgan Stanley's conduct. First, Morgan Stanley routinely purchased loans with excessive debt-to-income ("DTI") ratios, packing and securitizing the loans, syndicating the resulting securities for sale to investors, and receiving significant fees in this process.   Morgan Stanley dictated the types of loans that Lend America issued, requiring multiple high risk features as a condition for purchase of such loans. These combined risks put these minorities borrowers on path towards foreclosures and loss of properties.  High DTI ratios indicate that the loan is larger than the borrower can afford. Second, Morgan Stanley regularly purchased and securitized mortgage loans from Lend America where the loan-to-value ratio exceeded 100%. High loan-to-value ratios, which compare the amount of the loan to the value of the home, are loans where the borrower faces a greater risk of delinquency or foreclosure. Third, Morgan Stanley required Lend America to issue loans with adjustable rates and prepayment penalties. Morgan Stanley also purchased and securitized large numbers of  Lend America mortgage loans with balloon payment features, exacerbating a borrower's financial risk.  Fourth, Morgan  Stanley  provided  necessary  funding—in  the  form  of  warehouse  lending, precommittments to purchase loans, and funding for loan closings—to Lend America  that allowed it to remain in business until it was stopped by enforcement authorities from conducting business.     Fifth, Morgan Stanley purchased loans that deviated substantially from basic underwriting standards, going so far as to encourage lending tactics that increased the levels of risk associated with individual loans. By creating the conditions under which Lend America originated toxic loans, Morgan Stanley caused African-American borrowers to fall prey to those

loans at a disproportionate rate, or put another way, to make this homeowner nightmare come

true. As a result of these policies, Van Johnson like similarly situated people suffered financial

harm and extreme hardship. The loan in question, as has all the features that are narrated herein.

## PROCEDURAL BACKGROUND

9.      Debtor sought bankruptcy protection under Chapter 13 on October 27, 2009. The Chapter

13 plan was confirmed on 09/18/2009 without prejudice to the existing rights and claims of the

debtor against the allegedly secured parties.  The debtor did file an adversary objecting to the

claim filed by American Servicing Company on behalf of its trust that it is allegedly servicing

i.e. Morgan Stanley Trust 2006-6AR . However, it was voluntary withdrawn to file an amended

complaint.    The other reason was that the debtor and the undersigned counsel for the debtor

were misguided by the counsel for the defendants in the prior proceedings that they will work out

amicably and resolve the issues. The Proof of Claim filer, Hogan Lovells, counsels misled the

debtor in the bankruptcy proceeding itself stating that they will consider the loan modification.

All this was done to defeat the debtors interest.

## JURISDICTION

10.      This is an objection to proof of claim with attended relief attached to such objection to

the claims as filed by the defendants. Such objection is a core proceeding. See 28 USC § 157

(b)(5). This court, though the relief requested are under New York Banking Law 6-L (non-

congressional grant) has complete jurisdiction on this matter to enter decision, as the claim and

counterclaim arise from the same transaction. See *Stern v. Marshall*, 131 S. Ct. (2011).

ASC and BOA by filing a proof of claim against the estate, "trigger[ed] the process of

`allowance and disallowance of claims,' thereby subjecting themselves to the bankruptcy court's

equitable power. *Langenkamp v. Culp*, 498 U. S. 42 (1990) (per curiam)

12.     Here BOA/ASC claim and the ensuing New York Banking Law 6-L action by the plaintiff becomes integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction. *Granfinanciera, SA v. Nordberg*, 492 U. S., at 58.

**PARTIES**

13.     The plaintiff Van Johnson is the debtor in the underlying bankruptcy matter.

14.     Wells Fargo Bank, National Association is the master servicer (the "Master Servicer") of this trust with address as Wells Fargo Bank, National Association, P.O. Box 98, Columbia, Maryland 21046 (or, for overnight deliveries, 9062 Old  Annapolis Road, Columbia, Maryland 21045),

15.     Defendant Morgan Stanley Mortgage Capital 1 Inc., a Delaware corporation, as depositor (the "Depositor" is the owner of the Trust Fund that was conveyed  to the Trustee in return for the Certificates with their office at 1585 Broadway, New York, New York 10036,  Ex. PSA.

16.     Morgan Stanley Mortgage Loan Trust 2006-6AR is the corporate trust with Morgan Stanley Mortgage Capital Inc., a New York corporation with its office at 1221 Avenue of the Americas, New York, New York 10020,

17.     Lasalle Bank National Association  was the Trustee and Custodian of this trust and it merged with Bank of America.

18.     On or about April, 2006, pursuant to an agreement, the aforesaid defendants entered into a "Pooling and Servicing Agreement," regarding purchase and sale of mortgage securities as follows:

> This POOLING AND SERVICING AGREEMENT, dated as of April 1, 2006 (the
> "Agreement"), by and among MORGAN STANLEY CAPITAL I INC., a Delaware
> corporation, as depositor (the "Depositor"), LASALLE BANK NATIONAL
> ASSOCIATION, a national banking association, as trustee (the
> "Trustee"), and  as a custodian (a "Custodian") and WELLS FARGO BANK,
> NATIONAL ASSOCIATION, in its separate capacities as master servicer

(the "Master Servicer"), as securities administrator (the "Securities Administrator") and, in its capacity as Securities Administrator, as auction administrator (the "Auction Administrator") and acknowledged by MORGAN STANLEY MORTGAGE CAPITAL INC., a New York corporation, as seller (the "Seller"), for purposes of Section 2.05.

19.    As posited by the defendants in the underlying bankruptcy matter, Wells Fargo Bank, N.A., dba America Servicing Company is the servicing agent for the Defendant Bank of America, National Association, the trustee for the Morgan Stanley Trust 2006-6AR. Defendant, America Servicing Company is the filer of the Proof of Claim against the debtor's estate and claims to be owner of the mortgage and Note. One Ms. Elpiniki M. Bechakas, claiming to be Assistant Secretary and Vice President of Mortgage Electronic Registration System, Inc. as a nominee for Lend America its successors and assigned the underlying mortgage to Bank of America National Association as Successor by Merger to LaSalle Bank National Association, as Trustee for Morgan Stanley Mortgage Loan Trusts 2006-6AR.

Lend America operating under stewardship of Ideal Mortgage Banker is the originator of the loan.[1] ASC has a personal financial interest in the claim as they pick up servicing fees from collection on this loan.

## Claim filed Against the Estate

20.    The defendants and through ASC filed, on December 30, 2009, a Proof of claim numbered 2-1 on the case claim registry for a amount of $288,794.92.

## Factual Background:

21.    In 2006, Johnson, the debtor herein decided to purchase a house and contacted KR Management LLC and Malco Real Estate Inc. (KR Management collectively) with regards to

---

[1] Lend America is presently in bankruptcy proceeding. It is a necessary party to reflect the underlying transaction. No relief is sought against Lend America temporarily, as long as the relief from automatic stay is not granted.

their advertisement in a local paper for buying a home. Johnson called KR Management and they told him to come to their office. During this visit, KR Management filled out an application for the debtor and his credit was, unsurprisingly approved on the spot. Johnson disclosed to them that his health was not very good as he was suffering from Lupus and had a kidney transplant after going through more than 6 years of dialysis. They assured him that it would not deter him from getting the loan. KR Management convinced Johnson to buy one property, 128 Howard Avenue, Brooklyn New York, which they claimed they had remodeled and they made him sign a contract to purchase, and deposited $1000. Since KR Management was in the business of renovating old houses, they told Johnson that the closing will occur within three months. However, the closing occurred within one month. Prior to closing, Johnson was told that his closing costs would be around $5000. During closing, Johnson brought a certified check in such amount but was told that KR Management had decided to finance 100% of the sale since Johnson had good credit and he was a first time homebuyer.

22.    KR Management assured Johnson that they will take care of everything. KR Management contacted Lend America for loan procurement. Upon information and belief Lend America and KR management worked in collusion to attract new buyers and put them in the expensive loans, which they knew that the borrowers would not be able to repay.

23.    Lend America assured the Johnson that he has to just come for closing that they will do all essential part of the closing etc. Lend America supplied a lawyer named Scott Peckman who worked closely in such schemes of rolling out and closing in these expensive loans regarding the minorities.

24.    Lend America advised Johnson that he was so creditworthy that he does not have pay single dollar as down-payment. In reality, since these mortgages were immediately sold in the

secondary mortgage market, Lend America prepared these loans to appear to comply with rules established by the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). In order to package this loan for sale in the secondary mortgage market, the lenders must comply with the 80-20 rule, where the first mortgage can be no greater than 80% of the sales price and where the purchasers are to provide the other 20% by way of a deposit and additional funds. But the purchaser did not have $70,300 (20% of the $351,500 sales price) as additional funds. He only had $1,000 as a deposit and he also was willing to come up with $5000 as certified checks, which were deliberately ignored for Lend America its associates working there on commission wanted to inflate the sum borrowed so as to produce better commission. Therefore, Lend America decided to finance the other 20% plus their real estate fees or closing costs by taking a second mortgage.

25.    But to accomplish that and still be in compliance with the 80-20 rule, they increased or "bumped up" the sales price by more than $100,000. The seller had purchased property for just a month before the closing for $245,000 and sold to Johnson for $351,500 . Accordingly, the first mortgage was for $281,200 which is 80% of 351,500   and the second mortgage was for $70,300 (20% of $351,500, the increased sales price). Yet, the true sales price was still $324,899.67 ($351,500 contract price minus 26,600.33 closing price equals the true sale price), as it is the seller, KR Management that fielded the closing cost, that should have made the first mortgage ($281,200) 86.5% of the true sales price, which would have violated the 80-20 rule. The second mortgage of $70,300 was 21.6% of the $324,899.67 sales price.

### Two Loans to Complete One Transaction

26.    Lend America gave Johnson a second mortgage for the difference between the 80% first

mortgage and the 20% deposit money and the real estate expenses to close the two loans. The bank "discovered the gold" in financing a second mortgage loan at more lucrative rates than the first mortgage. To accomplish this goal the mortgage lender used the guise that the borrower could pay off the second mortgage earlier than the first mortgage; or the mortgage lender or KR Management would find the homeowners a better mortgage or a new home later so they could refinance their home with, yet more closing expenses in a year or so.

27.    It is undisputed that the money obtained from both loans were necessary to: 1) complete the real estate transaction, 2) satisfy the 80% first mortgage requirement of Fannie Mae and Freddie Mac and 3) avoid the requirements associated with "high cost loans," in excess of $300,000.

28.    Making two loans creates an added windfall that cuts in favor of the lender. While the borrower saves on private mortgage insurance payments, the lenders are able to generate additional closing fees. Moreover, the second loan was at a higher potential rate of interest than the primary loan because it is a riskier loan, which allows the lender to earn additional income based on a higher interest rate. And if the loan was to be sold, it would definitely earn more money as total loan package is valued at the expected return.

## Seller's funding the closing cost is a myth

29.    The real estate contract that listed $351,500 as the sales price.  The term seller's paying the closing cost or seller concession, the other name of same gratuitous gesture, implies that at the time of closing the seller is conceding a certain amount of the purchase price to enable the purchaser to complete the purchase. Using the facts presented in this case, a seller could concede or reduce an amount of the purchase price in order to pay for a portion of the purchase price

and/or the closing expenses. But a seller's concession or payment of closing cost as it is utilized in this transaction, is a misnomer with no foundation in logic or mathematics because the seller concedes nothing to the purchasers. In this case, the sellers inflated the price of their home from $245,000.00 to $351,500 to allow Johnson to borrow additional funds to close the transaction. The sellers conceded nothing other than to act as co-conspirators to circumvent the banking law restrictions on the closing costs to mortgage ratios and to manipulate the public records of the true sales prices and market data. The manipulation of the true property value in the public record takes on particular significance because the sales prices are used as comparative prices in real estate appraisals that are used to evaluate other similar sales of homes in the area, as well as in estates, matrimonial matters, and partition actions. This false data has been partially responsible for the inflated value of homes in low and middle income areas. By utilizing the seller's concession or assuming closing cost the true sales prices are inflated. Many racial minorities were victim of such schemes especially between 1998 to 2008.

30.    It is clear that if the seller's concession or the closing cost was not provided, the lender or the seller could not have made it's money. Additionally, by virtue of the fact that this transaction was more than 100% financed it was clear to the lender that the seller's concession or payment of closing cost was going to be used to fund all of plaintiff closing costs. In this transaction despite the said payment of closing cost of $26,600.33 in view of purchase price by seller $245,000 and sale receipt of $351,500 minus $26,600.33 leaves a profit of $70,899.69 in one month.

31.    This scheme and collusion of Lend America and KR Management and Malco Real Estate was executed to achieve which New York Bankiing Law 6L clearly prohibited. Lend America, the originator of the loan violated the strictures of New York Banking Law 6L.

## High Cost Home Loans

32.     The New York State Banking Law § 6–l(1)(d) states: "A High-cost home loan' means a

home loan in which the terms of the loan exceed one or more of the thresholds as defined in

paragraph (g) of this subdivision." Amongst the thresholds is sub-section (ii) which states:

> (ii) The total points and fees exceed: five percent of the total loan amount if
>
> the total loan amount is fifty thousand dollar or more....

Banking Law § 6–l(1)(g)(ii) states in pertinent part that the "threshold" in this case is where "...

[t]he total points and fees exceed five percent of the total loan amount ..." The statute further

defines "points and fees" as:

(i) All items listed in 15 U.S.C. § 1605(a)(1) through (4), except interest or the time-price

differential;

(ii) All charges for items listed under § 226.4(c) of title 12 of the code of federal regulations, as

amended from time to time, but only if the lender receives direct or indirect compensation in

connection with the charge or the charge is paid to an affiliate of the lender; otherwise, the

charges are not included within the meanings of the phrase "points and fees";

(iii) All compensation paid directly or indirectly to a mortgage broker, including a broker that

originates a loan in its own name in a table-funded transaction, not otherwise included in

subparagraphs (i) and (ii) of this paragraph; (Emphasis added).

(iv) The cost of all premiums financed by the lender, directly or indirectly, for any credit line,

credit disability, unemployment, or credit property insurance, or any other life or health

insurance, or any payment financed by the lender directly or indirectly for any debt

cancellation or suspension agreement or contract, except that insurance premiums calculated and paid on a monthly basis shall not be considered financed by the lender.

33.    The New York Banking Law incorporates the United States Code (USC) and the Code of Federal Regulations (CFR). Title 15 of the U.S.Code, § 1605(a)(1)–(4) includes the following points and fees:

(1) ... any amount payable under a point, discount, or other system of additional charges.

(2) Service or carrying charge.

(3) Loan fee, finder's fee, or similar charge.

(4) Fee for an investigation or credit report.5

34.    The following charges from 12 CFR 226.4 are exempt in calculating the threshold requirement in high cost home loans except in the event that "... if the lender receives direct or indirect compensation in connection with the charge or the charge is paid to an affiliate of the lender ...":

(7) Real-estate fees. The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii) Notary and credit report fees.

(iv) Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.

(v) Amounts required to be paid into escrow or trustee accounts if the amounts would not

otherwise be included in the finance charge. (Emphasis added).

35.    This real estate transaction was conditioned on whether Johnson could obtain a mortgage for $324,899.67 or 100% of the true sales price, rather than $281,200 amount, which included the seller's concession. Both figures were fully disclosed to the lender. Despite the language used in the seller's concession that seemingly indicates that the $26,600.33 will be applied toward the purchase price, it clear that Lender and Seller used the additional $26,600.33 financed to pay the real estate fees necessary to close the transaction.

36.    Based on the contractual language contained in the evidence submitted for consideration, as a matter of law it is clear that the lender, Lend America, indirectly received compensation in the form of interest on the loan used to finance the real estate fees at the time of closing. In this case, the contract between the parties fully disclosed to the lender that the entire transaction was to be financed, including the real estate fees.

**Total Allowable Points and Fees**

37.    Lend America violated the threshold amount associated with "high cost home loans" when it financed 100% of the purchase price plus all relevant real estate fees.

38.    The following list summarizes the totality of expenses and fees incurred in connection with the two loans given to Johnson in connection with the purchase of 128 Howard Avenue, Brooklyn, New York 11233, as presented by Johnson.  To compile this accounting of expenses and fees associated with the two loans Johnson relies on the HUD–1 Uniform Settlement Statement, as well as the contract provided by her attorney. The following are all of the listed "real-estate fees" (closing expenses) for the transaction in question. The fees allegedly for the second mortgage are annotated as "Second Loan."

## FIRST MORTGAGE LOAN EXPENSE

|  | | FEES |
|---|---|---|
| Origination fee to Lend America | $ | 2,812 .00 |
| Appraisal fee to Lend America | $ | 325 .00 |
| Loan Discount to Lend America | $ | 2,812 .00 |
| Lender's Inspection Fee to Lend America | $ | 150 .00 |
| Flood Certification Fee to Lend America | $ | 20 .00 |
| Tax Service Fee to Lend America | $ | 70 .00 |
| Interest | $ | 460 .86 |
| Hazard Insurance Premium to Joseph Tramontano | $ | 1,179 .00 |
| Settlement or Closing Fee to Kenneth Golden, Esq. | $ | 850 .00 |
| Title Insurance | $ | 3042 .00 |
| Pest Inspection | $ | 95 .00 |
| Survey | $ | 135 .00 |
| Recording Fee | $ | 600 .00 |
| City & County Taxes | $ | 1,406 .00 |
| State Taxes | $ | 3,515 .00 |
| Mortgage Tax | $ | 5,032 .00 |
| Purchasers Attorney Fee to Scott Packman | $ | 850 .00 |
| RPT 75 | $ | 225 .00 |
| **Total Expenses First Mortgage Loan** | **$** | **23,578 .86** |

| Second Mortgage Loan Expenses | | Fees | |
|---|---|---|---|
| Premium Second Mortgage Insurance | $ | 78 | .00 |
| Endorsements | $ | 75 | .00 |
| Loan Origination Fee to Lend America | $ | 703 | .00 |
| Loan Discount to Lend America | $ | 703 | .00 |
| Document Fee to Kenneth Golden, Esq. | $ | 275 | .00 |
| Interest | $ | 187 | .47 |
| **Total Second Mortgage Loan Expenses** | $ | **2,021** | **.47** |
| **Total Expenses First & Second Mortgage Loans** | $ | **25,600** | **.33** |

39.     Johnson entered into two separate and distinct mortgages to effectuate the purchase of his home in New York. We will omit those fees associated with the second loan.

**Calculation of Threshold**

40.     Banking Law § 6–l(1)(h) contains a formula that calls for the loan amount to be reduced by the total allowable points and fees paid by the borrower. In this case, the amount of the first mortgage is $281,200 and the total fees are $23,578.86. Therefore, subtracting $23,578.86 from $281,200 equates to $257,621.14 as the total loan amount for the threshold formula. In order to determine the threshold, the statute requires that the amount of the total loan be multiplied by 5%. Therefore, $257,621.14 multiplied by .05 equals $12,881.06. This figure represents that maximum amount of total allowable points and fees that may be paid for the closing. In this case, the actual total points and fees by the purchaser-borrower was $23,578.86, which exceeds the

total allowable points and fees by $10,697.80.   The lender therefore violated the statutory provisions of the New York Banking Law.

41.     It is undisputed that Van Johnson was given $281,200 (Note says $281,200) to finance the purchase of a house, where the extra $26,600.33[2] or 9.5% of the purchase price was used to pay points and fees associated with the closing on the property. Specifically, when examining the HUD–1 closing statement prepared at the time of closing, it is apparent that $26,600.33 was used to pay all costs and fees associated with securing the High Cost Loans. These monies were paid from financing received above and beyond the contract price of $281,200. This ultimately left Johnson with negative equity in the property.

42.     Further, the threshold requisiste of this loan to trigger New York Banking Law 6 is met in this transaction via the introductory rate, followed by a maximum rate of 13.375% (See Note) Section 6L(1)(g)(i) states:

(g) "Thresholds" means:

(i)  For a first lien mortgage loan, the annual percentage rate of the   home loan at consummation of the transaction exceeds eight percentage  points  over the yield on treasury securities having comparable periods   of maturity to the loan maturity measured as of the fifteenth day of the   month immediately preceding the month in which the application for the extension of credit is received  by the lender....; as determined by the following rules: if the terms of the   home loan offer any initial or introductory period, and the annual percentage rate is less than that which will apply after the end of such   initial or introductory period, then the annual percentage rate that  shall be  taken into account for purposes of this section shall be the  rate which applies after the initial or introductory period;

---

[2] Total cost of the two loans plus $1000 deposit paid by Johnson ($25,600.33 + $1000)

43.    Here, Note reflects an introductory rate of 7.375% however in 2011 it shall jump to 13.375% maximum.  For purpose of meeting the Annual Percentage Rate as used in this section 6L, adding 8% to the relevant treasury rate (4.83) adds to 12.83% which is less than 13.375% thus clearly making it a high cost loan under New York Banking Law 6L .

44.    The financing of the fees and points associated with the loan is also a violation of Banking Law 6–L(2)(m) which states:

"In making a high-cost home loan, a lender shall not, directly or indirectly, finance any points and fees as defined in paragraph (f) of subdivision one of this section, in an amount that exceeds three percent of the principal amount of the loan" (emphasis added).

45.    Here, the amount financed to cover the fees are in violation of the statute because the points and fees exceed 3% of the principal amount of the loan. Three percent of the loan equates to $8436.00(3% of  $281,200.). However, the expenses of the loan were $23,578.86 which equates to about 8.4 % which is more than the 3% allowed by the statute.

46.    Further, section 6L of the New York Banking Law states,  "a lender or mortgage broker shall not make or arrange a high-cost home loan without due regard to repayment ability, based upon consideration of the resident borrower or borrowers' current and expected income, current obligations, employment status, and other financial resources (other than the borrower's equity in the dwelling which secures repayment of the loan), as verified by detailed documentation of all sources of income and corroborated by independent verification." (emphasis added ).

47.    Johnson though clearly qualified for a regular loan, but she was deliberately put into the subprime loan so as to extract more monies from her. At the time of closing, these loans were considered sub-prime products, even though they had qualified for traditional fixed loan products at lower rates, because of their "A paper" credit worthiness.  It is also a violation of <u>Banking Law § 6–L</u>(2)(l )(I), which has been dubbed the "Counseling Statute." This section provides that a lender or mortgage broker must deliver, place in the mail, fax or electronically transmit the following notice in at least twelve point type to the borrower at the time of application: "You should consider financial counseling prior to executing loan documents. The enclosed list of counselors is provided by the New York State Banking Department." <u>Banking Law § 6–L</u>(2)(l )(ii) requires that the lender or mortgage broker within three days after determining that the loan is a high-cost loan, but no less that ten days before closing, give the "Consumer Caution and Home Ownership Counseling Notice" to the borrower. This was not done.

48.    Here, the documentary evidence demonstrates  a clear violations of <u>New York Banking Law § 6–L</u>(2)(k), which deals with the defendant's due diligence into the ability of the defendants to repay the loan. <u>New York Banking Law § 6–L</u>(2)(k) requires this inquiry to be "verified by detailed documentation of all sources of income and corroborated by independent verification." This failure to inquire is a violation of New York's Banking Law.  The defendant also violated <u>N.Y. Banking Law § 6–L</u>(2)(l )(I), which requires the lending institution to provide a list of credit counselors licensed in New York State to any recipient of a High Cost Loan. Failure to provide this notice is a violation of <u>N.Y. Banking Law § 6–L</u>(2)(l )(I). In this action, clearly the most egregious violation of N.Y. Banking Law is the violation  of <u>§ 6–L(2)(m)</u> which states that no more than 3 percent of the amount financed is eligible to pay the points and fees associated with closing the loans on the real property. The amount financed to cover the fees are

violative of the statute because more than 3% of the amount financed was used to pay the fees and points associated with the loan. The $23,578.86 in expenses equates to almost 8.4% of the High Cost Loan and is a clear violation of the statute.

49.    Based on the foregoing, , it is clear that the Lend America, in providing home financing to Johnson, violated, at least three provisions of New York's Banking Law i.e. violations of <u>N.Y. Banking Law § 6–L</u>(2)(k);  6–L(2)(l )(l);  6–L(2)(m);  6–L(2)(p )  6–L(2-a)(a) )  6–L(3); Consequently, the finding of these violations now triggers <u>N.Y. Banking Law § 6–L(7) through § 6–L</u>(10) which is the remedy and damages provisions of the statute.  The defendant 's violations also trigger relief under 6-L(11). Further, the other defendants are also liable under Section 6-L(13) as assignee of the loan.

50.    In this case, there is enough evidence that the Lender violated the anti-predatory lending statutes of New York's Banking Law. Therefore, debtor is entitled to receive: actual, consequential and incidental damages, as well as all of the interest, earned or unearned, points, fees, the closing costs charged for the loan; and a refund of any amounts paid. The intentional violation renders the home loan agreement (mortgage) void, and strips the lender from having a right to collect, receive or retain any principal, interest, or other charges whatsoever with respect to the loan, as well as giving the borrower the ability to recover any payments made under the agreement. Further that the hearing be used to determine the amount of damages.

51.    Further, the debtor also challenges property inspection fees, Title searches, proof of claim fees, escrow charges, property valuation transfer fees balance as improper, unfounded, unnecessary, just a ploy to make monies, not by the Note holder, but the servicer.  No documentation has been furnished for the authenticity or corroboration of such expenses.

## FAIR HOUSING ACT, CIVIL RIGHTS ACT, EQUAL CREDIT OPPORTUNITY ACT VIOLATED.

52.    The defendants acted in collusion to target the minorities, especially African-Americans to saddle them with high cost loans.

53.    Defendant Ideal Mortgage Bankers, LTD d/b/a Lend America  was one of the largest mortgage-lending companies in the United States.  Lend America promoted its home financing expertise by means of nationwide advertising campaigns, especially targeting minorities.   In its advertisements and through its brokers and other agents Lend America solicited persons to apply for financing with Lend America either in one of its offices or through one of the mortgage brokers whom Lend America has authorized to accept applications on its behalf. Lend America made home-mortgage loans directly to consumers through its various subsidiaries, substantively sub-prime loans through its agents.   Lend America also made home-mortgage loans that are arranged by its network of mortgage brokers.   Those loans are made in reliance on Morgan Stanley, Bank of America along with other related securitizing entities 's credit-granting policies and with the participation of Lend America

54.    Due to Defendant's  policies as to where to place its offices and how to market its products, black borrowers are more likely than white borrowers to apply for credit from Lend America . Defendants'  Discretionary Pricing Policy is unrelated to a borrower's objective credit characteristics such as credit history, credit score, debt-to-income ratio and loan-to-value ratios and results in purely subjective charges that affect the rate otherwise available to borrowers.

55.    Defendants' involved in the securitization process,   authorized mortgage brokers and Lend America with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensating mortgage brokers and lenders who arrange business for it.

56.     Morgan Stanley authorizes mortgage lender Lend America who had signed a contract with it to accept applications on its behalf, quote financing rates and terms on it (within the limitations set by Morgan Stanley), inform credit applicants of 's Morgan's financing options and to originate finance transactions using Morgan's instructions, in accordance with its policies.

57.     Morgan Stanley authorized Lend America, among others lenders to make loans based on its credit-granting policies. Morgan Stanley funded these loans before or shortly after they were consummated.

58.     In all of the home-mortgage-finance-transactions at issue, Morgan Stanley advanced the funds to make the loans and bears some or all of the risk of default. Morgan Stanley provided its lenders like Lend America with credit applications, loan contracts and other required financing forms, as well as instructions on filling out such documents necessary to complete home

59.     Although the plaintiff qualified for a best possible rate, a fixed rate mortgage and long term loan like similarly placed non-minority American, he was moved to a high risk loan with stringent penalties and a balloon payment with padded principal. Also inbuilt in the inflated principal was other additional unnecessary charge. These discretionary charges were paid by the customer as a component of the total finance charge (the "Contract APR"), without the homeowner knowing that a portion of their Contract APR was a non-risk-related charge. Upon information and belief such charges were missing from the non-minorities applicants.

60.     Defendants' Discretionary Pricing Policy, by design, causes persons with identical or similar credit scores to pay different amounts for the cost of credit. As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to

calculate the Par Rate are undermined and the potential for race bias becomes inherent in the transaction.

61.      The Discretionary Pricing Policy, although facially neutral (insofar as Lend America used the same or effectively the same policy for all credit applicants), had a disproportionately adverse effect on blacks compared to similarly situated whites in that blacks pay disparately more discretionary charges (both in frequency and amount) than similarly situated whites.

62.      The disparate impact suffered by blacks is a direct result of Defendants, Lend America and Morgan Stanley Discretionary Pricing Policy in that  Defendant's designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact.

63.      There are no legitimate business reasons justifying defendant's discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

## DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

### (15 U.S.C. §§ 1691-1691f)

64.      Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

65.      Equal Credit Opportunity Act makes it "unlawful for any creditor to discriminate  against any application, with respect to any aspect of a credit transaction—(1) on the basis of race, color, religion, national origin, sex or marital status, or age." 28 U.S.C. § 1691 (a).

66.      The Defendants are creditors as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to the Plaintiffs.  The Defendants designed, disseminated, controlled, implemented and profited from the

discriminatory policy and practice alleged herein--the Discretionary Pricing Policy--which has had a disparate economic impact on minorities compared to similarly situated whites.

67.    All actions taken by Lend America and Morgan Stanley officers and authorized brokers were in accordance with the specific authority granted to them by Morgan Stanley and were in furtherance of the Defendants' policies and practices.

68.    As a result of the Defendants' Discretionary Pricing Policy, the Defendants have collected more in finance charges from minority borrowers than from similarly situated white persons, for reasons unrelated to credit risk.

69.    The Defendants' Discretionary Pricing Policy violated the Equal Credit Opportunity Act. Plaintiff is an persons as defined in ECOA by virtue of having been subject to the Defendants' discriminatory, Discretionary Pricing Policy.

70.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.The Defendants engaged in residential real estate-related transactions with respect to the Plaintiff. The Defendants' Discretionary Pricing Policy has resulted in discrimination with respect to the Plaintiff. As a result of the Defendants' Discretionary Pricing Policy, the Defendants have collected more in finance charges from minorities than from similarly situated white persons, for reasons unrelated to credit risk. The Defendants' Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.  Plaintiff is an aggrieved person as defined in FHA by virtue of having been subject to the Defendants' discriminatory, Discretionary Pricing Policy.

## RACIAL DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT

### (42 U.S.C. § 1981)

71.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

72.    42 U.S.C. section 1981 provides that all person within the United States "shall have the same right in every State to make and enforce contracts . . . as is enjoyed by white citizens."

73.    Defendant has violated section 1981 by intentionally discriminating against the Plaintiff by charging higher interest rates and other fees and costs than were charged to similarly situated non-minority borrowers.

74.    Defendants unlawfully discriminated against Plaintiff in (1) formation of the contract, (ii) making, performance, medication, and termination of the contract, (iii) the enjoyment of all benefits, privileges, terms and condition o the contractual relationship, and/or (iv) conduct that interfered with the right to establish and enforce contract obligations.

75.    Defendants' action violate 42 U.S.C. § 1981 as was the rights of the Plaintiff under Fifth, Thirteenth, and Fourteenth Amendments of the Constitution of the Unite States.

76.    Plaintiff is entitled to injunctive, declaratory reliefs and damages, or make whole equitable relief as a result of the defendants' discriminatory conduct.

77.    At no time has Defendants undertaken corrective action to ameliorate its racially discriminatory practices. Defendants continues to reap the profits of its discriminatory practices. Defendants conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendants have acted with malice and reckless indifference to the federally protected rights of the plaintiff. As a result, Plaintiff is entitled to punitive damages.

## RACIAL DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT

### (42 U.S.C. § 1982)

78.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

79.    42 U.S.C. section 1982 provides that all citizens of the Untied States, "shall have the same right, in every State and Territory, as is enjoyed by White citizens thereof inherit, purchase, lease, sell, hold, and convey real and personal property."

80.    Defendants has discriminated against Plaintiff with respect to his mortgage loans by charging Plaintiff higher interest rates and other discretionary fees than Defendants have charged similarity situated non-minority consumers. As a result of Defendants conduct, plaintiff had the same right as whites to inherit, purchase, sell, hold, and convey real property. Defendants have thereby violated 42 U.S.C. § 1982.

81.    Defendants violations of 42 U.S.C. § 1982 was intentional and malicious.

82.    As a proximate result of Defendant's violation of 42 U.S.C. § 1982, Plaintiff have been injured, and are entitled to injunctive and declaratory relief and damages, or make whole the equitable relief. Defendants conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendants have acted with malice and reckless indifference to the federally protected rights of the plaintiff. As a result, Plaintiff is entitled to punitive damages.

Accordingly it is hereby requested that a judgment be entered against all the defendants:

1. Declaring that defendants violated New York Banking Law Section 6-L;

   2. Declaring the entire loan amount as asserted against the debtor by the defendants as uncollectible and the contract as void under New York Banking Law;

   3. Pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613, declaring the acts and practices of Defendants complained of herein to be in violation of ECOA and the FHA;

   4. Return of all the monies paid by the debtor from the inception of the loan including principle, interest and other charges with respect to the loan;

   5. Declaring the rescission of the loan and removal of any lien on the debtor's residence;

6. Award of legal fees in favor of the debtor against the defendants.

7. Order actual and punitive damages and/or restitution to the Plaintiff.

8. Any other relief that the court finds just here in this case.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York New York
October 4, 2013

/s/

Karamvir Dahiya, Esq. for the Plaintiff